Asher **RUBINSTEIN**

v.

**ADMINISTRATORS OF TULANE, et al.**

No. Civ.A. 95–3343.

United States District Court, E.D. Louisiana.

March 6, 1998.

704

William Martin McGoey, Evans & Clesi, PLC, New Orleans, LA, for Plaintiff.

Julie Durel Livaudais, George Phillip Shuler, III, Julie D. Savage, Richard Barry Ramirez, Chaffe, McCall, Phillips, Toler & Sarpy, LLP, New Orleans, LA, for Defendants.

### *ORDER AND REASONS*

LEMMON, District Judge.

Considering the memoranda of counsel and the applicable law, IT IS ORDERED that defendant's Motion for Summary Judgment (Doc. # 52) in the above captioned matter be and hereby is GRANTED in part and DENIED in part, and that plaintiff's Objection to Magistrate's Order (Doc. # 68) be and hereby is DENIED. The court assigns the following reasons for its rulings.

### I. BACKGROUND

Plaintiff Asher Rubinstein filed suit in October 1995 against the Administrators of the Tulane Education Fund ("Tulane") and Paul Michael Lynch and William C. Van Buskirk, in their individual and official capacities. Plaintiff, an associate professor in the Department of Mechanical Engineering, a department of the School of Engineering, at Tulane University, alleges that these defendants gave him comparatively lower salary increases than other faculty members in June 1992, June 1993, June 1994, and June 1995. Plaintiff also alleges that these defendants denied him a full professorship and refused to allow him to participate fully in the school's affairs. Plaintiff claims that these decisions were made on the basis of his religion and his national origin. Plaintiff also alleges that

his requested salary increase in 1997 was denied in retaliation for his having filed this suit. Plaintiff alleges that defendants' actions are proscribed by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e–17, and by Louisiana Revised Statutes 23:1006, 51:2242 & 51:2256. Plaintiff has filed an Objection to Magistrate Judge's Order in which he seeks review of an order of the magistrate regarding discovery of certain items. Defendants have filed a Motion for Summary Judgment in which they seek summary judgment on all of plaintiff's claims.

### II. OBJECTION TO MAGISTRATE JUDGE'S ORDER

#### A. *STANDARD OF REVIEW*

A magistrate judge's pretrial discovery order may be reversed by a district judge if the order is clearly erroneous or contrary to law. *See* Fed.R.Civ.P. 72(a); 28 U.S.C. S 636(b)(1)(A). Unless the district court finds that there was clear error in the magistrate's ruling, that ruling will not be set aside or modified. *See, e.g., Western Atlas Int'l, Inc. v. Adriatic, Inc.,* Civil Action No. 96–0513, 1997 WL 732419 at *1 (E.D.La.1997) (Berrigan, J.).

#### B. *MAGISTRATE JUDGE'S ORDER*

Plaintiff seeks review of the magistrate judge's refusal to compel discovery of several items. Before this case was transferred to this court, plaintiff filed a Motion to Compel Discovery Requests (Doc. # 9), in which the plaintiff sought to compel the defendants to produce several items. Among these requests, were the following:

> *REQUEST NO. 20:*
> Produce any promotion files and third year review files related to professors in the School of Engineering in the last five years, including but not limited to any files relating to Reda Bakeer.
>
> *REQUEST NO. 21:*
> Produce any documents or communications related to the grant of tenure and promotion of Reda Bakeer.

*REQUEST NO. 22:*

Produce any documents indicating the salary history of all faculty members (including faculty members holding administrative positions) in the College of Engineering since 1987.

The magistrate judge granted the plaintiff's Motion to Compel, at least to the extent that plaintiff's motion sought to compel production of the documents in Request Nos. 20, 21 and 22, stating:

REQUESTS NOS. 19, 20, 21 & 22— **GRANT**; SUBJECT TO A MUTUALLY ACCEPTABLE PROTECTIVE ORDER TO PROTECT PRIVACY INTERESTS OF NON–PARTIES HEREIN.

Defendants filed a Motion for Review of the Magistrate's Order (Doc. # 17), in which defendants requested that the district court reverse the magistrate judge's granting of plaintiff's Motion to Compel to the extent that it required production of the documents sought in Request Nos. 20 & 22. The presiding district judge vacated the magistrate judge's order which required production of the documents sought in Request No. 20, stating:

The court **VACATES** the Magistrate Judge's ruling on this request, and the court **DENIES** the request because it calls for the production of documents pertaining to professors who are not similarly situated to plaintiff.

To the extent that this request would encompass documents pertaining to the Mechanical Engineering Department, the request is duplicative of Request Number 19.[1]

*See* Order at p. 4 (Doc. # 25) (footnote added). The district judge also amended the magistrate judge's order, which required production of the documents sought in Request No. 22, stating:

Defendants claim that the Magistrate Judge's Order granting this request fails

to restrict the salary information to those similarly situated to plaintiff. Further, Defendants argue they should not be required to produce "any" document indicating salaries but that due to confidentiality concerns, a list of the salary histories since 1992 would be reasonable.

The court now **AMENDS** the Magistrate Judge's Order to *limit* the production of requested documents to a *"list" of the salary history pertaining to mechanical engineering professors;* however, the court declines to limit the time period, as proposed by Defendants.

*See* Order at pp. 4–5 (Doc. # 25) (emphasis in original).

Plaintiff subsequently filed a Motion to Reconsider Prior Discovery Rulings and to Compel Response to Discovery Requests (Doc. # 55), in which plaintiff requested, among other things, that the magistrate judge compel the defendants to produce the documents sought in Request No. 20. Plaintiff argued that depositions of defendants' witnesses after the district court's ruling revealed that the documents sought in Request No. 20 are relevant because the criteria for promotion are uniform throughout the School of Engineering and therefore plaintiff is in fact similarly situated with other professors throughout the School of Engineering. Plaintiff also reiterated its request for an order compelling production of the documents sought in Request No. 21.

The magistrate judge issued an order which granted plaintiff's request in part and denied plaintiff's request in part, stating:

**DENIED in part;** as to motion to compel school-wide discovery due to reversal of the Magistrate Judge's prior order that would have allowed discovery beyond the Mechanical Engineering De-

---

1. Request No. 19 asked for production of: ... any and all promotion files and third year review files related to faculty members in the Mechanical Engineering Department in the last 10 years.

The magistrate judge granted the plaintiff's request that the defendants be compelled to produce the documents sought in this request, and the district court affirmed the magistrate judge's ruling.

partment of the School of Engineering. The District Judge's ruling has become the law of the case and we cannot overrule same.

*See* Order (Doc. # 61). Plaintiff has now filed an Objection to Magistrate Judge's Order in which he requests that this court reverse the magistrate judge's rulings and compel defendants to respond to Request Nos. 20, 21 and 22.

 Although the magistrate was correct in concluding that he could not overrule the district judge's prior ruling, the "law of the case" doctrine does not necessarily bind this court from revisiting the previously presiding district judge's ruling in this case.[2] Moreover, the plaintiff's discovery requests are premised on a need for discovery which allegedly arose subsequent to the district court's previous decision. Therefore, the law of the case doctrine does not apply to the plaintiff's discovery requests to the extent that these requests are based on newly discovered needs. In sum, the previous district judge's orders relating to plaintiff's discovery requests do not restrict this court's ability to rule on plaintiff's current requests.

Plaintiff argues that subsequent discovery reveals that the criteria for promotion and tenure are uniform throughout the School of Engineering; therefore, the documents sought in Request No. 20, the promotion files and third year review files of all of the professors in the School of Engineering for the past five years, should be discoverable. Plaintiff notes that these documents may reveal that other associate professors were promoted despite having student teaching evaluations comparable to those of plaintiff. Plaintiff also argues that this subsequent revelation, coupled with the plaintiff's belief that Reda Bakeer was discriminated against on the basis of his national origin (which differs from plaintiff's), indicates that the documents sought in Request No. 21, the promotion and tenure file of Reda Bakeer, should be discoverable. Finally, plaintiff argues that William C. Van Buskirk, Dean of the School of Engineering, in his subsequent deposition, articulates as one of the reasons for failing to give plaintiff the raise he sought for the 1997–98 academic year was that plaintiff's salary was inordinately high for an associate professor. Thus, plaintiff argues that the basis of comparison for concluding that plaintiff's salary was inordinately high must have been school-wide rather than department-wide because the only other associate professor in the Mechanical Engineering Department has only been with that department for two years while plaintiff has been with the department for ten years. Accordingly, plaintiff argues that the salary history for all faculty members in the School of Engineering since 1987 should be discoverable.

To the extent that plaintiff's requests seek information regarding differential treatment between himself and others throughout the School of Engineering, this evidence would be relevant only to establishing plaintiff's prima facie case of discrimination. As discussed more fully be-

2. Recently, in *Agostini v. Felton*, —— U.S. ——, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), the Supreme Court discussed the "law of the case doctrine," stating:
 Under this doctrine, a court should not reopen issues decided in earlier stages of the same litigation. *Messenger v. Anderson*, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152 (1912). The doctrine does not apply if the court is "convinced that [its prior decision] is clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. 605, 618, n. 8, 103 S.Ct. 1382, 1391, n. 8, 75 L.Ed.2d 318 (1983).

*Agostini*, 521 U.S. at 236, 117 S.Ct. at 2017. Thus, the law of the case doctrine does not always compel adherence by a transferee judge to issues previously decided in a case by a transferror judge. As one commentator has noted:
 ... the law of the case doctrine is not a limit on a court's power to reconsider issues once decided. Instead, it is only a convenient means of expressing the practice that courts employ of generally refusing to reopen settled issues.
John R. Knight, *The Law of the Case Doctrine: What Does it Really Mean?*, FEDERAL LAWYER, October 1996, at 2.

low, the court holds that plaintiff meets his burden of presenting a prima facie case of discrimination but fails to fulfill his other burdens. Therefore, this requested discovery is not relevant nor likely to lead to the discovery of relevant evidence.[3] Moreover, to the extent that plaintiff's requests seek information regarding possible discrimination against another professor on the basis of national origin, but not on the basis of the same national origin as the plaintiff, the evidence which plaintiff seeks to discover would also be irrelevant. For these reasons, and in light of the policy expressed by the magistrate and the previously presiding district judge of protecting the privacy interests of others in the School of Engineering, this court overrules plaintiff's objections to the magistrate's rulings.

## III. MOTION FOR SUMMARY JUDGMENT

### A. STANDARD OF REVIEW

A party is entitled to summary judgment upon a showing that no genuine issue as to any material fact exists and that the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992); Fed.R.Civ.Proc. Rule 56(c). In making its determination as to whether summary judgment is appropriate, the Court must draw all justifiable inferences in favor of the non-moving party. *Anderson,* 106 S.Ct. at 2513; *Oliver Resources PLC v. International Finance Corp.,* 62 F.3d 128, 130 (5th Cir.1995). To

oppose a motion for summary judgment, the non-movant cannot rest on mere allegations or denials but must set forth specific facts showing that there is a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Floors Unlimited, Inc. v. Fieldcrest Cannon, Inc.,* 55 F.3d 181, 184 (5th Cir.1995); Rule 56(e). A material fact is any fact "that might affect the outcome of the suit under the governing law." *Anderson,* 106 S.Ct. at 2510. If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. *Saunders v. Michelin Tire Corp.,* 942 F.2d 299, 301 (5th Cir.1991).

### B. PRESCRIPTION AND STATUTE OF LIMITATIONS

#### 1. STATE LAW CLAIMS

 Defendants argue that plaintiff's state law discrimination claims have prescribed as to defendants' refusal to award plaintiff an increase in pay during the years 1992, 1993, and 1994.[4] The one-year prescription period set forth in Louisiana Civil Code Article 3492 applies to discrimination actions brought pursuant to Louisiana Revised Statute 23:1006. *See Williams v. Conoco, Inc.,* 860 F.2d 1306, 1307 (5th Cir.1988); *Bustamento v. Tucker,* 607 So.2d 532, 541 (La.1992). In the present case, plaintiffs' state law discrimination claims brought pursuant to Louisiana Revised Statute 23:1006 which were based on pay decisions made in June of

---

3. Federal Rule of Civil Procedure 26(b)(1) governs the general scope of discoverable material, stating:

 Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things

and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

4. Plaintiff's Memorandum in Opposition to the defendants' Motion for Summary Judgment fails to address defendants' prescription argument.

1992, June of 1993, and June of 1994, prescribed before the plaintiff filed his complaint in October of 1995. Accordingly, defendants are entitled to summary judgment on plaintiff's state law claims for refusal to award an increase in pay in 1992, 1993 and 1994.

## 2. *FEDERAL LAW CLAIMS*

■ Defendants argue that plaintiff's federal law discrimination claims that defendants' refused to award plaintiff an increase in pay during the years 1992 and 1993 are barred by the applicable statute of limitations.[5] A party alleging a violation of Title VII of the Civil Rights Act of 1964 must file a complaint with the Equal Employment Opportunities Commission ("EEOC") within 180 days from when the alleged discriminatory act occurred, or within 300 days from this act if the forum state in which the claim is brought is a "deferral" state.[6] 42 U.S.C. § 2000e–5(e)[7]

■ Plaintiff's federal law discrimination claims brought pursuant to Title VII

**5.** Plaintiff's Memorandum in Opposition to the defendants' Motion for Summary Judgment fails to address defendants' prescription argument.

**6.** A deferral state is a state in which state law prohibits discrimination and a state agency exists for the purpose of granting relief for such discrimination. *Clark v. Resistoflex Co.,* 854 F.2d 762, 765 n. 1 (5th Cir.1988). The Louisiana Commission on Human Rights is a state agency charged with these types of duties and has been funded and in operation since April of 1994. LSA R.S. 51:2233 (West Supp.1997); G. Guidry, *Employment Discrimination Claims in Louisiana,* 45 LA.B.J. 240, 241 (Oct.1997). Although the Fifth Circuit has not yet held that Louisiana is a "deferral" state, it has applied the 300 day statute of limitations in cases applying the laws of the state of Texas, which has a similar state agency. *See Urrutia v. Valero Energy Corp.,* 841 F.2d 123, 125 (5th Cir.), *cert. denied,* 488 U.S. 829, 109 S.Ct. 82, 102 L.Ed.2d 59 (1988).

**7.** This section provides in relevant part:

(e) Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system

of the Civil Rights Act of 1964, which were based on pay decisions made in June of 1992 and June of 1993, were filed with the EEOC in December of 1994—outside of the prescribed timeframe for filing a complaint. Accordingly, defendants are entitled to summary judgment on plaintiff's federal law claims for refusal to award an increase in pay for 1992 and 1993.

## C. *NATIONAL ORIGIN AND RELIGIOUS DISCRIMINATION CLAIMS*

Defendants seek summary judgment on plaintiff's federal and state-law national origin and religious discrimination claims. Louisiana Revised Statute 23:1006 prohibits discrimination on the basis of national origin and religion. Louisiana generally looks to federal precedent interpreting federal discrimination laws to interpret its discrimination laws.[8] Accordingly, the viability of plaintiff's state law discrimination claims are premised on the viability of plaintiff's federal law discrimination claims.

(1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

**8.** *See Branch–Hines v. Hebert,* 939 F.2d 1311, 1317 (5th Cir.1991); *Bennett v. Corroon & Black Corp.,* 517 So.2d 1245, 1246 (La.App. 4th Cir.), *writ denied,* 520 So.2d 425 (La. 1988).

In order to prevail in a discrimination claim under Title VII of the Civil Rights Act of 1964, a plaintiff must present a prima facie case of discrimination. Because no one test can fully cover all of the different types of discrimination which are forbidden by Title VII and the different contexts in which claims of discrimination arise, the prima facie case a plaintiff must establish in a discrimination claim varies somewhat with the facts of each case. *See Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 1093–94 n. 6, 67 L.Ed.2d 207 (1981). In setting forth the elements of a prima facie case of discrimination, courts generally use as a model the elements of the prima facie case set forth in *Burdine,* a case involving an allegation of racially discriminatory hiring. In *Burdine,* the Court noted that to establish a prima facie case of racially discriminatory hiring, a plaintiff must establish:

(1) that he belongs to a racial minority;

(2) that he applied and was qualified for a job for which the employer was seeking applicants;

(3) that, despite his qualifications, he was rejected;

(4) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Burdine,* 101 S.Ct. at 1089, 1093–94 n. 61; *see also McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

In the present case, plaintiff claims that the defendants failed to grant him a full-professorship and failed to increase his pay on the basis of his national origin and religion. To establish a prima facie case, plaintiff must present evidence that:

(1) he was a member of an identifiable national origin or religion;

(2) he was qualified for the benefits or promotion he sought;

(3) he was denied these benefits or this promotion and this denial constituted an adverse employment decision; and

(4) the adverse employment decision was differentially applied to plaintiff.

Once a plaintiff presents this prima facie case, defendant has the burden to produce a legitimate non-discriminatory reason for its actions. *E.g., Messer v. Meno,* 130 F.3d 130, 137 (5th Cir.1997). Plaintiff then bears the burden of establishing that the defendant's proffered reason is pretextual and, ultimately, that the defendant discriminated on an unlawful basis. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993).[9]

---

9. The parties dispute the evidentiary standards to be applied in Title VII cases in the university setting. Defendants preface their legal arguments in their Memorandum in Support of their Motion for Summary Judgment with quotes from the Fifth Circuit cases of *Dorsett v. Board of Trustees for State Colleges & Univ.,* 940 F.2d 121 (5th Cir.1991), and *Berry Schs. v. NLRB,* 627 F.2d 692 (5th Cir.1980), to the effect that universities are to be afforded deference in their employment decisions. (Defendants' Memorandum in Support of its Motion for Summary Judgment at p. 12). The plaintiff vehemently opposes defendants' alleged suggestion that the standard burden shifting analysis outlined above does not apply with equal vigor in the university setting. The court recognizes that the Fifth Circuit made the following statement in *Dorsett,* a case involving a claim of retaliatory

harassment in violation of proscriptions of the First Amendment:

> Of all fields that the federal courts " 'should hesitate to invade and take over, education and faculty appointments at [the university] level are probably the least suited for federal court supervision.' " *Smith v. University of North Carolina,* 632 F.2d 316, 345 & n. 26 (4th Cir.1980) (quoting *Faro v. New York Univ.,* 502 F.2d 1229, 1231–32 (2d Cir. 1974)).

*Dorsett,* 940 F.2d at 124. The court also recognizes that the Fifth Circuit made the following statement in *Berry Schools,* a case involving a claim of unfair labor practices:

> Taking into account the non-industrial nature of a college or university, the Board, in interpreting the facts de novo, and this Court, on review, must give some deference to the discretion of the administration in

## 1. PRIMA FACIE CASE

The parties do not dispute that plaintiff belonged to an identifiable religion, Judaism; he was of a recognizable national origin, Russia; and he suffered an adverse employment decision. The parties dispute whether plaintiff was qualified for a full professorship and an elevated increase in salary and whether the denial of these benefits was differentially applied to plaintiff—the second and fourth elements of plaintiff's prima facie case.

### a. Qualification

■ Defendants argue that plaintiff has failed to present evidence that he was qualified for the benefits he sought, the rank of full professor and an elevated increase in pay, because he was not performing his duties with the level of proficiency necessary to justify the awarding of these benefits. In *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940 (8th Cir.1994), the United States Court of Appeals for the Eighth Circuit noted that to establish the second element of a plaintiff's prima facie case of discrimination, a plaintiff need not disprove any alleged conduct violations, but need only establish that he had the requisite qualifications for the position he holds. *Davenport*, 30 F.3d at 944. In *Davenport*, a plaintiff filed suit against his former employer alleging that his former employer declined to renew his contract of employment on the basis of his race. *Id.* at 942–43. The employer countered that it declined to renew plaintiff's contract on the basis of several conduct violations committed by the defendant. *Id.* In discussing the qualification element of the plaintiff's

prima facie case of discriminatory discharge under Title VII, the court stated:

On the second element, which the district court referred to as "adequate job performance," the district court considered the four alleged infractions which defendant cited as grounds for denying plaintiff's contract renewal; because plaintiff did not dispute the fact that the alleged incidents occurred, the district court apparently concluded that plaintiff had failed to make a sufficient showing on the second element. This determination by the district court was analytically flawed for several reasons. First, recognizing that the prima facie case in discrimination cases varies somewhat with the specific facts of each case, *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253–54 n. 6, 101 S.Ct. 1089, 1093–94 n. 6, 67 L.Ed.2d 207 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n. 13, 93 S.Ct. 1817, 1824 & n. 13, 36 L.Ed.2d 668 (1973) (McDonnell Douglas)), we believe that the second element in the present case should have been phrased in terms of whether plaintiff was "qualified" for his position. *See, e.g., St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (in race discrimination case, for unlawful demotion and discharge, plaintiff established second element of prima facie case by showing that he was qualified for the position); *Hase v. Missouri Div. of Employment Sec.*, 972 F.2d 893, 896 (8th Cir.1992) (Hase) (in age and gender discrimination case, for unlawful failure to promote, plaintiff established second

determining who among the ranks of associate professors will achieve the distinct honor of full professorship.

. . . .

This Court does not sit as a reviewing body of the correctness or incorrectness of the Board of Regents' decision in granting or withholding tenure. This is founded on the policy that federal courts should be loathe to intrude into internal school affairs.

*Berry Schools*, 627 F.2d at 705–706 (omission added). To the extent that defendants intend to rely on these statements as somehow mak-

ing the evidentiary burdens more deferential for defendants in the university setting, the court notes that these statements are taken out of context from cases not directly involving Title VII claims and therefore do not change the burden shifting analysis set forth above. Accordingly, the court notes that the burden shifting analysis set forth above does indeed, as plaintiff asserts, apply with equal vigor in the context of university employment decisions, despite whatever policy considerations might weigh in favor of a more deferential standard in an academic setting.

element by showing she met the minimum qualifications for the position). Second, by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action—in other words, to prove pretext and the ultimate issue of intentional discrimination. The prima facie burden is not so onerous. *See Johnson v. Arkansas State Police,* 10 F.3d 547, 551 (8th Cir.1993) (threshold of proof necessary to make a prima facie case is minimal and district court improperly conflated prima facie case with ultimate issue). Third, taken to its logical extreme, the district court's reasoning could have ended the inquiry prematurely, thus denying plaintiff the opportunity to show that, even if these incidents did occur, defendant unlawfully responded by treating plaintiff differently from others who were similarly situated, on account of his race. We hold that plaintiff did show that he was qualified for the teaching and coaching positions which he had held for several years, and that he therefore met his burden of establishing the second element of his prima facie case, at least to the extent necessary to withstand a motion for summary judgment.

*Id.* at 944. Although the *Davenport* case is not binding authority, it is persuasive authority and the reasoning contained therein is sound. Accordingly, for purposes of this Motion for Summary Judgment, the plaintiff need not present evidence that he was actually performing his duties with the proficiency necessary to justify the awarding of the benefits he sought in order to establish his prima facie case. Instead, he need only present evidence that he was minimally qualified for such benefits; that is, he need only present evidence that with his qualifications, he

could have been given the benefits he seeks.

■ Plaintiff has presented evidence that he has served as an associate professor for Tulane since 1987 and was granted tenure in 1990. The rank of associate professor is defined in the Tulane Faculty Handbook as follows:

Associate Professor:

Appointment to this rank is accorded to an individual who has attained scholarly distinction of high quality as demonstrated by teaching and by published scholarly work. Both areas of accomplishment are essential: High achievement in one cannot compensate for deficiencies in the other. Other service to the University will serve as strong support for the evidence of quality provided by the candidate's teaching and publication record.

(Exhibit 1 attached to defendant's Memorandum in Support of Motion for Summary Judgment). The rank of full professor is defined as follows:

Professor:

Appointment to the Rank of Professor is made not merely on the basis of the rank of service but in recognition of outstanding quality. The title signifies that the holder is a mature scholar of distinguished achievement who has won national or international standing in his or her field and a successful teacher with a record of service to the University.

*Id.* Because the plaintiff is already a tenured associate professor and there is no set minimal length of service for a full professorship, plaintiff has presented evidence from which a reasonable jury could find that he is minimally qualified for the rank of full professor. Likewise, because the elevation of an associate professor's periodic increase in pay is not tied to any set formula which includes a minimal length of service, and indeed, may outpace that of a full professor,[10] the plaintiff has

---

10. Attached as exhibit 17 to the defendants' Memorandum in Support of their Motion for Summary Judgment are several memoranda in which defendant Mike Lynch, Chairman of the Mechanical Engineering Department at Tulane recommends varying percent salary increases for the professors and associate professors in that department. These memoran-

presented evidence from which a reasonable jury could find that he is minimally qualified for an elevated pay increase. Accordingly, plaintiff has presented evidence sufficient to establish the qualification element of his prima facie case.

b. *Differential Treatment*

■ The defendants argue that plaintiff has failed to present evidence that the denial of these benefits, full professorship and elevated pay increases, was differentially applied to the plaintiff. Plaintiff presents evidence that in fact other associate professors in his department were promoted to the position of full professor during plaintiff's tenure and that other professors and associate professors received higher pay increases. (Exhibits 26 & 33 Attached to Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment). Specifically, plaintiff presents evidence that, of all of the raises given to faculty members of the Mechanical Engineering Department, his was the lowest percent raise. Accordingly, plaintiff has presented evidence sufficient to establish the differential treatment element of his prima facie case.

2. *LEGITIMATE NON-DISCRIMINATORY REASON*

■ Once a plaintiff presents evidence sufficient to establish a prima facie case of discrimination, the defendant bears the burden of producing a legitimate, non-discriminatory reason for its actions. *E.g., Messer v. Meno,* 130 F.3d 130, 137 (5th Cir.1997). Defendants present evidence that plaintiff's teaching skills, university citizenship, and relations with students were inadequate to warrant the promotion to full professor or to warrant higher pay raises. Defendants present a copy of a memorandum from Hugh Thompson, Dean of Engineering, to Dr. Francis Lawrence, Academic Vice President and Provost, dated December 6, 1989, which recommends plaintiff for the award of tenure, but with

the express reservation concerning plaintiff's teaching abilities in introductory courses. (Exhibit 7 Attached to Defendants' Memorandum in Support of Defendants, Motion for Summary Judgment). Defendants also present a copy of a memorandum to plaintiff from Professor Michaelides, Head of the Mechanical Engineering Department, dated October 28, 1991, in which Professor Michaelides notes that he will not support plaintiff's application for full professorship on the basis that plaintiff's teaching abilities, student evaluations of those abilities, and plaintiff's relations with students, did not warrant promotion. (Exhibit 9 Attached to Defendants, Memorandum in Support of Defendants' Motion for Summary Judgment).

■ Defendants also present a memorandum to plaintiff from Professor Paul Lynch, Department Chairman, dated April 29, 1994, in which Professor Lynch sets forth the results of an informal evaluation of plaintiff's request for promotion conducted by a faculty committee in the Fall of 1993. (Exhibit 11 Attached to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment). In this memorandum, Professor Lynch states that plaintiff's teaching skills were not sufficiently proficient to warrant promotion to full professor. This memorandum also contains an analysis of student surveys and how the average responses to student surveys of plaintiff compared to the averages of the department. Defendants also present a memorandum from Professor Lynch to William C. Van Buskirk, Dean of the School of Engineering, dated January 31, 1995, setting forth the results of the review of plaintiff's application for full professorship by the Promotion and Tenure Committee of the Department of Mechanical Engineering and noting that the application was denied on the basis of plaintiff's relations with others, both faculty and stu-

da indicate that there is no single set of criteria for recommendations for raise increases and that the percent raise recommended var-

ies based upon a number of criteria that the Chairman of the Department finds significant.

dents, and his teaching abilities as reflected in student surveys. (Exhibit 12 Attached to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment). Defendants also present a memorandum from Professor Michaelides to Professor Van Buskirk, dated February 8, 1996, which discusses the results of the Promotion and Tenure Committee of the Department of Mechanical Engineering meeting of 1996 and the reasons for its recommended denial of the plaintiff's application for full-professorship, citing plaintiff's failure to mentor doctoral students and the committee's mixed evaluations of plaintiff's teaching abilities. (Exhibit 13 Attached to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment). Defendants also present a memorandum from Professor Michaelides to Professor Van Buskirk, dated January 17, 1997, which discusses the results of the Promotion and Tenure Committee of the Department of Mechanical Engineering meeting of 1997 and the reasons for the recommended denial of the plaintiff's application for tenure, citing plaintiff's continued failure to mentor doctoral students and the plaintiff's inadequate teaching abilities. (Exhibit 13 Attached to Defendants' Memorandum in Support of Defendants' Motion for Summary Judgment). In addition, the defendants submit the deposition testimony of Professors Lynch, Michaelides, Mehrabadi and Watts, all of which state that plaintiff's teaching abilities played a significant part in the denial of plaintiff's request for promotion. These depositions also stress that plaintiff's alleged lack of collegiality, and therefore his lack of university citizenship, played a large role in their challenged decisions. (*See also* Exhibit 9 attached to defendants' Memorandum in Support of its Motion for Summary Judgment). Through these exhibits and depositions, defendants have met their burden of producing a legitimate, non-discriminatory reason for failing to promote plaintiff and for failing to give plaintiff an elevated increase in salary—plaintiff's inadequate teaching skills and his poor student relations and university citizenship.

### 3. *PRETEXT*

 Once a defendant presents a legitimate, non-discriminatory reason for its actions, the plaintiff then bears the burden of producing evidence that the proffered reason is pretextual and ultimately, that discrimination was a motivating factor in the defendant's decision. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993). "Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Kline v. Tennessee Valley Authority,* 128 F.3d 337, 342–43 (6th Cir.1997).

Plaintiff argues that defendants' proffered reasons are pretextual because the two committees charged with evaluating the plaintiff's applications were comprised of similar members, his ability to mentor students and thereby improve his student relations was hampered by the defendants, and the evaluations upon which his teaching skills were assessed had been tampered with.

### a. *Mixed committee membership*

 Plaintiff argues that a member of the Executive Committee of the School of Engineering also was a member of the school-wide Tenure and Promotion Committee, in violation of eligibility requirements for serving on the Tenure and Promotion Committee. Plaintiff does not specifically delineate where this policy disallowing membership on both committees is memorialized nor the role that this alleged violation of policy played in harming the plaintiff. Assuming this policy existed and was violated, this violation does not in any manner tend to establish that defendants' proffered reasons, i.e. poor relations and university citizenship and inadequate teaching ability, are a pretext for discrimination.

### b. *Relations and university citizenship*

Plaintiff argues that several other persons prevented plaintiff from improving his relations with students and his university citizenship; therefore, defendants' explanation that its decision to deny plaintiff the benefits he sought was based on plaintiff's poor student relations and poor university citizenship is pretextual. Specifically, plaintiff claims that he did not participate in department committees because Professor Lynch failed to assign plaintiff committee responsibilities in 1992 and 1993 and that, after these years, plaintiff had to specifically request committee assignments. (Plaintiff's Affidavit at p. 7). Plaintiff also claims that Professor Lynch thwarted plaintiff's attempts to participate in committee work by failing to secure funding for seminars after plaintiff was assigned as chairman of a seminar committee. Further, plaintiff claims that he was unable to mentor students because the department in which he worked failed to offer teaching assistant positions to applicants in plaintiff's field of expertise. *Id.* at 7–8.

In evaluating a motion for summary judgment, evidence is viewed in the light most favorable to the non-movant. If believed, plaintiff's testimony establishes that his ability to improve relations among students and mentor students was impeded by the defendants themselves. Thus, a reasonable jury could find that defendants' proffered legitimate, non-discriminatory reasons—plaintiff's poor relations with students and failure to mentor students—were not credible. Accordingly, plaintiff has presented evidence from which a reasonable jury could find that these proffered reasons for denying plaintiff the benefits he sought—that plaintiff's university citizenship and student relations were low—were pretextual.

### C. *Teaching skills*

Plaintiff argues that the student evaluations used in measuring his teaching abilities were miscalculated and selectively employed; therefore, defendants' proffered explanation that plaintiff was denied the benefits he sought because of his inadequate teaching skills was pretextual. Plaintiff states in his affidavit attached to his Memorandum in Opposition to defendants' Motion for Summary Judgment:

20. His student evaluation scores have been improving overall throughout the years. Initially he had relatively poor scores. However, when he first arrived at Tulane, he did not allow open book tests or formula sheets during exams, whereas his colleagues in the department did. This practice was not received well by the students. He thereafter allowed the students to bring formula sheets and immediately and dramatically his student evaluation scores improved.

21. The average of the 229 evaluations handed in by students of plaintiff during the last five years for question 16/26 is 2.1 ("2" meaning good), Thirty-two percent of these students rated him as "1", meaning excellent, and forty-two percent rated plaintiff as "2", meaning good. Fourteen percent of these students rated him as "3", meaning average. Nine percent of these students rated him as "4", meaning fair. Two percent of these students rated him as "5", meaning poor. (The total is 99% instead of 100% because the numbers are rounded off).

22. In 1992, plaintiff discovered that there was a mistake in the tabulation of his scores because the Dean's office reported receiving more evaluations than the number of students who registered and attended the class. The dean's office showed that he had a 1.4 average rating for a course he taught, when actually his average was better—a 1.3. The Dean's executive secretary, Linda Miller, claimed that the error was caused by mistakenly including a student evaluation from another professor's course in plaintiff's course evaluations.

23. In January 1996, plaintiff reviewed his evaluations prior to the Dean's office tabulations. The Dean's office made copies at plaintiff's request. The aver-

age response was 1.5. However, when the Dean's office's tabulations were communicated to plaintiff, the score was 1.6, a worse score. The original evaluations retained by the Dean's office are missing one evaluation form, on which a student gave plaintiff the highest score of "1" on question 16/26; instead, there is one additional evaluation with a score of "2". The total number of student evaluations in the file did not change. This had the effect of slightly lowering plaintiff's average for the course.

24. In the Spring of 1995, he noticed that "Rubinstein" was written on top of an evaluation form in the hand writing of the Dean's Secretary. Plaintiff recognized the writing to be the same as the writing that appeared routinely on memoranda that he had received from the Dean's office. He compared the handwriting to the handwriting of the students in the class and there was no match. He compared the handwriting to handwriting on several memoranda from the Dean's office and the handwriting matched that of the Dean's secretary. The student evaluation on which this writing appears is negative.

25. Additionally, for several years plaintiff conducted his own student evaluation survey on the same day as the Dean's office conducted the survey. Usually the results of this unofficial survey very closely correlate with the results of the Dean's office survey, both in the numerical average and in the handwritten comments. Plaintiff uses the same form as the Dean's office. However, in the fall of 1996, there is a significantly higher (worse) numerical average for question 26/16 on the Dean's set of evaluations as compared to the set of evaluations collected by plaintiff. Additionally, unlike in previous years, many of the students' comments on the unofficial set did not appear in the Dean's set of evaluations.

Viewed in a light most favorable to the non-movant, plaintiff's testimony may lead a reasonable jury to conclude that a few of his evaluations were altered and/or tampered with. However, plaintiff's testimony does not tend to establish that the evaluation scores he would have received but for the alleged tampering were sufficient to establish that his teaching skills were in fact adequate to warrant a promotion to full-professor and a higher salary. At most, plaintiff's testimony establishes only that in a few isolated instances his student evaluation scores in certain classes might have been higher. Plaintiff's testimony does not tend to establish that the change in his scores would have substantially changed the broader analysis of his overall teaching abilities. Thus, plaintiff has failed to establish that defendants' explanation that plaintiff's teaching skills were insufficient to warrant these benefits is pretextual.

### 4. DISCRIMINATION

Evidence of discriminatory animus lies at the heart of a discrimination claim. An analysis of plaintiff's evidence of discriminatory animus is therefore appropriate. Plaintiff argues that the true bases for the defendants' refusal to promote him to the position of full professor and refusal to grant him an increase in pay are plaintiff's religion and national origin. In *Walton v. Bisco Indus., Inc.*, 119 F.3d 368 (5th Cir. 1997), the Fifth Circuit noted that:

> The plaintiff cannot succeed by proving only that the defendant's proffered reason is pretextual. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 2751, 125 L.Ed.2d 407 (1993). Rather, "a reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." *Id.* (emphasis in original).

*Walton*, 119 F.3d at 370 (footnote omitted).[11] Thus, in addition to presenting

---

11. In *Bodenheimer v. PPG Indus.*, 5 F.3d 955 (5th Cir.1993), the Fifth Circuit discussed the disarray in the circuits prior to the *Hicks* decision, stating:

Prior to the Supreme Court's recent decision in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), confusion reigned among the circuit

evidence that defendants' proffered explanations for their action are pretextual, plaintiff must also present evidence that his religion or national origin were a motivating factor in the decision to take action. *See* 42 U.S.C. § 2000e–2(m).[12]

> courts as to whether the plaintiff could prove employment discrimination simply by showing that the defendant's reasons were not credible. *See St. Mary's*, 509 U.S. at 511, 113 S.Ct. at 2750. The Court in St. Mary's put the issue to bed. To prevail ultimately, the plaintiff must prove, through a preponderance of the evidence, that the employer's reasons were not the true reason for the employment decision and that unlawful discrimination was. *St. Mary's*, 509 U.S. at 506, 113 S.Ct. at 2747.

*Bodenheimer*, 5 F.3d at 957. Subsequently, in *Rhodes v. Guiberson Oil Tools*, 39 F.3d 537 (5th Cir.1994), a case brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34, the Fifth Circuit discussed the following language found in *St. Mary's:*

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination, ... and the Court of Appeals was correct when it noted that, upon such rejection, 'no additional proof of discrimination is required.'

*See Rhodes*, 39 F.3d at 542 n. 5 (discussing the above quote from *St. Mary's*, 113 S.Ct. at 2749). In *Rhodes*, the Fifth Circuit concluded that this language was dicta to the extent that it suggested that a plaintiff need not present any evidence beyond his prima facie case and evidence that the defendant's proffered reason for taking action was pretextual, in order to succeed on a discrimination claim. *Id.* at 542–43. Judge Emilio M. Garza dissented, noting that six other circuits have interpreted this language as holding that rejection of the defendant's proffered reasons for its actions, coupled with the presentation of a prima facie case, is sufficient evidence from which a reasonable jury may find in favor of a plaintiff. *Id.* at 549–51.

The Fifth Circuit granted a rehearing en banc, and on rehearing, discussed the above quoted language of *St. Mary's*, stating:

> It is unclear, however, whether the Court intended that in all such cases in which an inference of discrimination is permitted a verdict of discrimination is necessarily supported by sufficient evidence. We believe that the question does not yield a categorical answer. Rather, we are convinced that ordinarily such verdicts would be supported by sufficient evidence, but not always. The answer lies in our traditional sufficiency-of-the-evidence analysis. *See* Deborah C. Malamud, *The Last Minuet: Disparate Treatment After Hicks*, 93 MICH.L.REV. 2229, 2305

> (1995) (noting that "the Court stressed in *Hicks* that once a *McDonnell Douglas– Burdine* case reaches the pretext stage, it is to be treated like any other civil case."). We test jury verdicts and motions for summary judgment for sufficiency of the evidence under the *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir.1969) (en banc), standard. Under *Boeing*, "[t]here must be a conflict in substantial evidence to create a jury question." *Id.* at 375. Substantial evidence is defined as "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 374. Consequently, "[a] mere scintilla of evidence is insufficient to present a question for the jury." *Id.* Even if the evidence is more than a scintilla, "Boeing assumes that some evidence may exist to support a position which is yet so overwhelmed by contrary proof as to yield to a directed verdict." *Neely v. Delta Brick and Tile Co., Inc.*, 817 F.2d 1224, 1226 (5th Cir.1987). FN4. The standard for granting a Rule 56 motion for summary judgment or a Rule 50 motion for judgment as a matter of law is the same. Consequently, the presence of a jury verdict on the renewal of a Rule 50 motion should make no difference to the inquiry. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

> Our *Boeing* analysis applies to circumstantial as well as direct evidence. Because direct evidence is rare in discrimination cases, a plaintiff must ordinarily use circumstantial evidence to satisfy her burden of persuasion. See *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1085 (5th Cir.1994). Thus, this circuit has held repeatedly that a plaintiff need not provide direct evidence to sustain a jury finding of discrimination. *See, e.g., Burns v. Texas City Refining, Inc.*, 890 F.2d 747, 751 (5th Cir.1989). Similarly, *Hicks* does not cast aside circumstantial evidence as a means of allowing a factfinder to infer discrimination.

*Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir.1996) (en banc).

12. This section provides:

> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Plaintiff presents evidence that Dr. Watts, who served as a member of the Promotion and Tenure Committee of the Department of Mechanical Engineering during 1995, 1996 and 1997,[13] as chair of that committee in the latter two years, and as a member of the School of Engineering Committee on Promotion, Tenure and Third–Year Review during the latter two years, made several disparaging remarks to plaintiff. Specifically, plaintiff presents the affidavit of Professor Watts which contains the following exchange:

Q: During your conversation with Professor Rubinstein over the years do you recall ever referring to him as a Russian Yankee?

A: Not–Not that specifically, no. We used to badger each other at lunch when he used to come to lunch with us. And he used to call me a hillbilly or hick or something, and I used to call him a commie. I don't recall calling him a Russian Yankee, but its entirely possible.

Q: Okay. Did Dr. Rubinstein ever express to you any displeasure at being referred to as a commie or any other way relating to his Russian origins.

A: No. I had never said anything to Asher that I considered insulting or that I thought he considered insulting. It was just joking around. I'm sorry. He didn't call me a hillbilly. He called me a redneck. That was the word he used.

(Affidavit of Robert G. Watts attached as exhibit 27 to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment at p. 15–16). Plaintiff also presents his testimony given by way of deposition which contains the following exchange:

Q: What comments do you remember Professor Watts making?

A: Well, at some point, like in Spring '94, I believe he start to make comments about Jews.

Q: Watts made comments about Jews?

A: About Jews, yes—

Q: Do you remember any?

A: —about Jews, about Jewish rituals. An what was your question?

Q: Do you remember any of the comments that he made?

A: Well, he was particularly upset about his daughter getting married to a Jew and that he would have to attend wedding with some Jewish rituals in it, and I mean, it was only one for a few months, and a large number of comments like this, and at the same time, he was making jokes about his first wife happened to be Jewish, and so his children a quarter Jewish, and he made jokes about that, too.

Q: He made jokes about his own children?

A: Yes, he said that his—one of these jokes kind of imprinted in my mind.

**13.** In 1995, the Promotion and Tenure Committee of the Department of Mechanical Engineering consisted of Professors Lynch, Thompson, Mehrabadi, Watts, and Michaelides, and the School of Engineering Committee on Promotion, Tenure and Third–Year Review consisted of Professors Buckles, Gonzalez, Papadopoulos, Bundy, Mehrabadi, Duvoisin, and Nunez. (Exhibit 12 Attached to Defendants' Memorandum in Support of their Motion for Summary Judgment). In 1996, the Promotion and Tenure Committee of the Department of Mechanical Engineering remained the same and the School of Engineering Committee on Promotion, Tenure and Third–Year Review consisted of Professors Watts, Nunez, Hsieh, Niklaus, John, Buckles, and Walker. (Exhibit 13 Attached to Defendants' Memorandum in Support of their Motion for Summary Judgment). In 1997, the Promotion and Tenure Committee of the Department of Mechanical Engineering consisted of Professors Lynch, Mehrabadi, Watts, and Michaelides, with Professor Mehrabadi not participating due to sabbatical leave, and the School of Engineering Committee on Promotion, Tenure and Third–Year Review consisted of Professors Watts, Nunez, Hsieh, Bruce, Bundy, Papadopolous, and Petry. (Exhibit 14 Attached to Defendants' Memorandum in Support of their Motion for Summary Judgment).

He said that his children are a quarter Jewish but all three-quarters went to one girl, [ ], because she's tight with money.

Q: Okay. These comments by Professor Watts all took place in the Spring of 1994, as far as you remember?

A: These kind mostly, yes.

Q: Did you say anything in response to these comments?

A: No, I didn't want to raise confrontation. I just eventually stopped going to these lunches.

Q: Do you remember any other comments about religion or national origin?

A: About—

Q: —by Professor Watts

A: About the period maybe a little later, he consistently start calling me Russian Yankee.

Q: Russian Yankee?

A: Russian Yankee, yes, because I'm Russian, and I came from New York. Russian Yankee. And everything happened in Russia, negative, for something that could be ridiculous, he always would bring it up to me and kind of—

Q: In a joking manner or not?

A: No, it was not a joking manner. He used to joke about my accent before, which I kind of used to dismiss as a joke or something, but at some point, it came out kind of—I could see that he really irritated by all this. He consistently pretend that he could not understand me because of my accent and make these remarks, and like every time he would go to meeting, and it would be somebody from Russia, and if there was anything ridiculous to say, he would tell it.

Q: Wait. Say that again. If he went to a meeting and there was somebody from Russia—

A: From Russia, and it was—if it was anything kind of ridiculous to comment about it, he would do it to me.

Q: Okay. And did you ever say anything to him about that? That you didn't appreciate those comments or anything?

A: I mentioned to him that I kind of not responsible for what's going on in Russia for a long time already.

(Affidavit of Asher Rubinstein attached as exhibit 28 to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment at p. 78–80) (omission added).

Plaintiff also presents an unsigned memorandum, which Professors Watts, Lynch and Michaelides admit preparing, in which the following statements are made:

1. We agree that recruiting underrepresented minorities and women to serve on the Engineering School faculty if [sic] a positive thing. In particular, this would aid in the recruitment of students, especially graduate students, from the pool of women and under represented minorities. We have always welcomed and will continue to welcome, applications from all who wish to apply for faculty positions, regardless of race or gender.

2. There has been considerable progress in the Engineering School in hiring women professors and graduate students.

3. In 1991, 8.96% of new Engineering PhDs were women and 2.33% were African Americans. 2.98% were Hispanic and .26% were Native Americans. Our faculty employs 4 (15.4%) women and 4 Hispanics (15.4%). There are currently no African or Native Americans.

4. 55 African Americans (2.33%) and 452 women (9%) received PhDs in Engineering in 1991. Almost all of them were heavily recruited by the most prestigious schools in the coun-

try. They serve both their constituencies and their own self-interests best by accepting positions at these universities. We do not help either their cause or their careers by enticing them to come to Tulane.

5. In any case, we would have to pay a premium salary to entice them, especially African Americans to come to Tulane. During a time of severe budget cuts this would no doubt lead to discontent among the current faculty.

6. Since so few women and (especially) African Americans pursue PhD degrees in Engineering, the School of Engineering would have a much more difficult time recruiting them than many departments in LAS. Under the current plan we would stand a good chance of losing faculty lines to LAS departments. Pitting faculties against faculties in this manner is particularly poor practice when budget cuts have already caused tension among departments.

7. The various departments in the School of Engineering are already severely stressed. All departments are at or even below a bare minimum of critical mass.

. . . . .

Therefore we, the Faculty of the School of Engineering, view the action of the President and Provost as coercive, conceived in order to further their own socio-political interests, and destructive to the educational purposes of the School of Engineering and of Tulane University.

(Exhibit 29 attached to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment).

14. Plaintiff fails to cite the evidence from which this statement is taken. The deposition of Dr. Thompson discusses Professor Bakeer's complaint, but only in general terms. (Deposition of Professor Hugh Thompson attached as exhibit 14 to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment at pp. 88–91). Plaintiff also states in his Memorandum in Opposition:

Plaintiff presents the deposition testimony of Professor Van Buskirk, in which Professor Van Buskirk claims that another associate professor, Reda Bakeer, complained that Professor Bruce may have discriminated against him in his application for a promotion and that Professor Bruce had called him an "Arab." (Exhibit 10 attached to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment at pp. 18 & 222)). Plaintiff also states in his Memorandum in Opposition to defendants' Motion for Summary Judgment:

Dr. Bruce also told Dr. Bakeer that he didn't have to worry about getting tenure because if the Russian Jew (a reference to plaintiff) in Mechanical Engineering could obtain tenure, anyone at Tulane could.

(Memorandum in Opposition to Defendants' Motion for Summary Judgment at p. 26).[14] Plaintiff also attaches a copy of an offensive cartoon which Professor Bruce allegedly brought to a faculty meeting. (Exhibit 47 attached to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment). Plaintiff also presents the deposition testimony of Professor Mehrabadi, which notes that Professor Mehrabadi once stated that he had read an article which stated that Israeli secret police had trained the former Shah of Iran's secret police. (Deposition of Professor Mehrabadi attached as exhibit 44 attached to plaintiff's Memorandum in Opposition to defendants' Motion for Summary Judgment at pp. 39–40).

Most of the evidence presented by the plaintiff is irrelevant to the question of whether plaintiff was discriminated against on the basis of his national origin or religion. The memo discussing hiring

In the Spring of 1995, Dr. Lynch told Professor Rubinstein that he would not hire a highly qualified Chinese student as a teaching assistant because he didn't want 'some Chinese guy running the lab (paraphrase)'. (Memorandum in Opposition to Defendants' Motion for Summary Judgment at pp. 28–29). Plaintiff fails to cite the evidence from which this statement is taken.

practices of racial and gender minorities expresses an opinion on the school's affirmative action policies and is neither expressly or impliedly racist or sexist in nature. Moreover, even if this memorandum were interpreted as expressing hostility toward African–Americans, Hispanics, Native Americans or women, the plaintiff is not a member of any of these classes. This memorandum is irrelevant to plaintiff's claims of discrimination based on his Judaism and his national origin.

For similar reasons, the alleged statements by Professor Bruce concerning "Arabs" and the offensive cartoon allegedly displayed by Professor Bruce at most express hostility toward persons of Arabian descent—a class to which plaintiff is not claiming membership. Therefore, these alleged remarks and this cartoon are irrelevant to plaintiff's claims of discrimination based on his Judaism and national origin.

The statement of Professor Mehrabadi concerning the fact that he had read that Israeli secret police trained the Shah of Iran's secret police does not express any form of animus based on plaintiff's religion. The statement reflects the fact that Professor Mehrabadi repeated that a story was published which claims that Israeli secret police trained the Shah of Iran's secret police and does not in itself express any form of animus. Thus, this statement is not relevant to the question of whether plaintiff has been discriminated against on the basis of his religion or national origin.

■ The remaining evidence consists of the alleged statements of Professor Watts referring to plaintiff as a "Russian Yankee" and relaying a joke suggesting that Jewish persons are thrifty, and the claim in plaintiff's Memorandum in Opposition that Professor Bruce remarked that, if "the Russian Jew" could attain tenure, then anyone could. In *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir.1996), a case involving an allegation of age discrimination in an employment termination, the Fifth Circuit noted that to serve as sufficient evidence of discrimination, the comments must be:

1) age related;

2) proximate in time to the terminations;

3) made by an individual with authority over the employment decision at issue; and

4) related to the employment decision at issue.

*Brown,* 82 F.3d at 655 (citing *Turner v. North American Rubber, Inc.,* 979 F.2d 55, 59 (5th Cir.1992)). This four-step inquiry has subsequently been adapted by other district courts in evaluating comments upon which other types of employment discrimination claims have been based. *See, e.g.,Warren v. Blockbuster Music,* Civil Action No. 96–1018, 1997 WL 47780 at *5 (E.D.La. Feb.6, 1997) (Berrigan, J.) (applying the four-step analysis set forth in *Brown* to an employment discrimination case involving allegations of race and sex discrimination), *aff'd,* 132 F.3d 1456 (5th Cir.1997). Applying this four-step inquiry to the facts in the present case, plaintiff must establish that (1) the statements made by Professors Bruce and Watts were related to plaintiff's religion or national origin; (2) they were made in proximate time to the decisions not to grant plaintiff a full-professorship or a pay raise; (3) Professors Bruce and Watts had authority over these decisions; and (4) the statements were related to these decisions.

■ The statements allegedly made by Professors Bruce and Watts were related to plaintiff's religion and national origin and Professors Bruce and Watts both served on committees which decided not to grant plaintiff a full-professorship or a larger pay raise. However, plaintiff has failed to present evidence that these statements were made in proximate time to these decisions or that these statements were related to the decisions concerning plaintiff's application for a full-professorship or pay raise.

5. *CONCLUSION*

Plaintiff has failed to present evidence from which a reasonable jury could find

that defendants discriminated against him on the basis of his religion or national origin in failing to grant him a full-professorship or a higher salary. Accordingly, defendants are entitled to summary judgment on plaintiffs' state law and federal law discrimination claims.

### D. RETALIATION CLAIMS

Defendants argue that they are entitled to summary judgment on plaintiffs' retaliation claim. Section 2000e-3(a) of Title 42 of the United States Code provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

The same burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), used in employment discrimination claims is used in claims of unlawful retaliation. *See McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir.1983). In *Long v. Eastfield College*, 88 F.3d 300 (5th Cir.1996), the Fifth Circuit noted that to establish a prima facie case of unlawful retaliation, a plaintiff must present evidence that:

> (1) that [the plaintiff] engaged in activity protected by Title VII;
>
> (2) that an adverse employment action occurred; and
>
> (3) that a causal link existed between the protected activity and the adverse employment action.

*Long*, 88 F.3d at 304 (alteration added). The Fifth Circuit went on to explain that:

> once the plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. If the defendant introduces evidence which, if true, would permit the conclusion that the adverse employment action was non-discriminatory, the focus shifts to the ultimate question of whether the defendant unlawfully retaliated against the plaintiff.

*Id.* at 304–305 (internal citations omitted).[15]

---

**15.** The Fifth Circuit also noted:

> At first glance, the ultimate issue in an unlawful retaliation case—whether the defendant discriminated against the plaintiff because the plaintiff engaged in conduct protected by Title VII—seems identical to the third element of the plaintiff's prima facie case—whether a causal link exists between the adverse employment action and the protected activity. However, the standards of proof applicable to these questions differ significantly. The ultimate determination in an unlawful retaliation case is whether the conduct protected by Title VII was a "but for" cause of the adverse employment decision. *McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1346 (5th Cir.1985). In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate

an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct. *Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984). The standard for establishing the "causal link" element of the plaintiff's prima facie case is much less stringent. *See McMillan*, 710 F.2d at 1116–17 (holding plaintiff's evidence sufficient to meet causation element of prima facie case but insufficient to prove ultimate question of "but for" causation). The Eleventh Circuit has recognized this distinction explicitly, holding that a plaintiff may satisfy the "causal link" element of his prima facie case by showing that the protected activity and the adverse employment action "were not wholly unrelated." *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 385, 88 L.Ed.2d

In the present case, it undisputed that plaintiff has engaged in an activity protected by Title VII—filing a claim with the EEOC and subsequently filing a claim of unlawful discrimination. It is also undisputed that an adverse employment decision occurred—plaintiff was denied pay raises and full-professorship. The parties dispute, however, whether there is a causal link between plaintiff's engaging in a protected activity and the adverse employment decision, whether defendants have presented a legitimate non-discriminatory reason for the decision, and ultimately, whether plaintiff has presented evidence of unlawful retaliation. As previously noted in the analysis of plaintiff's discrimination claims, defendants have presented legitimate, non-discriminatory reasons for refusing to give plaintiff the pay raise and full-professorship plaintiff sought. Therefore the only remaining questions are the related issues of whether plaintiff has presented evidence of a causal link between plaintiff's engaging in a protected activity and the adverse employment decision and whether plaintiff has presented evidence of unlawful retaliation.

 Plaintiff claims that, in response to plaintiff's inquiry regarding a memorandum sent from plaintiff, Professor Van Buskirk stated "What—are you going to sue me? Do you know what happens to people who sue their employer?" Plaintiff also presents the deposition testimony of Professor Van Buskirk which contains the following exchange regarding the refusal to give plaintiff a pay raise for the 1997–98 year:

Q: And I take it that there are some negative aspects of his performance for that year that you considered?

A: Yes.

Q: And can you tell me what the negative aspects are that you considered in making that recommendation?

A: Well, in the Fall of '96 he got the worst teaching evaluations in the school, reverting to form. And, in my opinion, he's a very poor university citizen.

Q: And what actions or failure to act regarding university citizenship did you take into account?

A: I've tried to convey in my deposition this concept we have of a community of scholars. Citizenship refers to one's membership in that community. In asking whether someone is a good citizen, you ask the question: Is that person a colleague? A good college has certain characteristics which I think Professor Rubinstein fails to exhibit.

A colleague, when disturbed by another colleague's remarks is to go to that person in private and talk it through and say: I don't know if you're aware of this, but what you're saying hurts my feelings, and I wish you would be more sensitive about that. He doesn't have a lawsuit about it.

A good colleague who's part of a community uses the resources of the community to resolve differences. He doesn't use external resources. He doesn't haul colleagues into court to try to resolve differences.

A good colleague doesn't lead his attorney down a path of systematically destroying his relationships with his colleagues in the department with these invidious distinctions and comparisons.

. . . .

All of that suggests to me that he is a very poor university citizen.

(Deposition of William C. Van Buskirk attached as exhibit 10 to plaintiff's Memorandum in Opposition to defendants' Mo-

---

338 (1985). Though we need not today adopt the Eleventh Circuit's approach, we do note that a plaintiff need not prove that her protected activity was the sole factor motivating the employer's challenged deci-

sion in order to establish the "causal link" element of a prima facie case. *De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 857 n. 12 (5th Cir.1982).

*Long*, 88 F.3d at 305 n. 4.

tion for Summary Judgment at pp. 229–30). Thus, plaintiff has presented evidence from which a reasonable jury could find that not only was there a causal link between defendants' actions and plaintiff's protected activity, but that plaintiff's protected activity was a motivating factor in defendants' actions. Accordingly, defendants are not entitled to summary judgment on plaintiff's retaliation claim.

## E. INDIVIDUAL CAPACITIES

■ Defendants argue that Professors Lynch and Van Buskirk cannot be held liable in their individual capacities on plaintiff's claims. In *Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.), *cert. denied,* 513 U.S. 1015, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994), the Fifth Circuit held that Title VII does not permit the imposition of liability upon individuals acting on behalf of another entity, unless they themselves meet the definition of an "employer" within the meaning of Title VII. *Grant,* 21 F.3d at 653. Plaintiff acknowledges the applicability of *Grant* but argues nevertheless that *Grant* should be overruled. This court may not "overrule" the precedent established by the Fifth Circuit and declines plaintiff's invitation to do so. Accordingly, defendants Lynch and Van Buskirk are entitled to summary judgment on plaintiff's remaining viable claim—his retaliation claim—to the extent that plaintiff seeks to impose liability on these defendants in their individual capacity.

## F. CONCLUSION

In sum, defendants are granted summary judgment on all of plaintiff's federal-law and state-law national origin and religious discrimination claims. Defendants are also granted summary judgment on all of plaintiff's federal-law and state-law claims, including both discrimination claims and retaliation claims, against defendants Paul Michael Lynch and William C. Van Buskirk in their individual capacities. Defendants are denied summary judgment on plaintiff's federal-law and state-law retaliation claims against Tulane and against Paul Michael Lynch and William C. Van Buskirk in their official capacities.